**In the Matter of Amy L. BROWN, James William Tipton and Beulah Brown Tipton, Plaintiffs/Appellants,**

v.

**Nephi P. BROWN, Defendant/Appellee.**

**Deborah Ann HALL, Plaintiff/Appellant,**

v.

**Harry Samuel HALL, III, Defendant/Appellee.**

Supreme Court of Tennessee, at Knoxville.

Feb. 1, 1993.

David B. Hill, Newport, for the Tiptons, plaintiffs/appellants.

Larry C. Vaughan, Knoxville, for Deborah Hall, plaintiff/appellant.

Steven E. Marshall, Sevierville, for Nephi Brown, defendant/appellee.

William A. Reeves, Chad B. Tindell, Knoxville, for Samuel Hall, defendant/appellee.

## OPINION

DAUGHTREY, Justice.

These two cases were not tried together, nor were they consolidated on appeal. However, we granted permission to appeal in both of them in order to treat two aspects of the same issue: the determination of jurisdiction to hear an interstate child custody dispute under the Uniform Child Custody Jurisdiction Act (UCCJA) and the federal Parental Kidnapping Prevention Act (PKPA), and the circumstances under which a trial court that has jurisdiction should nevertheless decline to exercise it under state and federal law. We have therefore elected to treat them as companion cases for the purposes of this opinion.

In the first case, *In the Matter of Amy L. Brown* (*Tipton v. Brown*), the courts of Tennessee and Hawaii exercised jurisdiction almost simultaneously, the former granting custody of the child to her maternal grandparents in Cocke County, Tennessee, shortly after her mother died, and the latter granting custody to her father, a resident of Hawaii. The Court of Appeals ruled that the judgment of the Hawaii court should have been recognized and enforced by the Tennessee court, under the Full Faith and Credit clause of the United States Constitution.

In the second case, *Hall v. Hall*, the custodial parent sought modification of a Tennessee child custody decree in Georgia, where she and the child were living. When the non-custodial parent, still a resident of Knoxville, sought modification of the original decree in the Tennessee court that originally rendered it, that court declined to act, finding that Georgia was the appropriate forum. The Court of Appeals reversed the trial court's judgment, holding that Georgia lacked jurisdiction to modify the Tennessee decree, and remanded the case to the Knox County court for trial. The ruling was based on our opinion in *State ex rel. Cooper v. Hamilton*, 688 S.W.2d 821 (Tenn.1985).

### 1. *Child Custody Jurisdiction*

Traditionally, jurisdiction to determine a child custody dispute was based on the child's domicile (which, under the common law, was the father's domicile.)[1] Because of the nature of such disputes, however, the rule of domicile was considered unworkable by many courts, because, strictly applied, it left them without authority to act in the best interest of a child who was before the forum and in grave need of protection. Gradually, courts began to assume and exercise jurisdiction in those custody-related matters involving children who were present in the state.

But this solution soon proved unworkable, too, because it unintentionally fostered "child-snatching"—the search for a friendly forum by a non-custodial parent or guardian seeking to overturn an unfavorable decree from another state. As divorce because more common and society more mobile, the volume and complexity of interstate child custody decrees increased dramatically. The courts in most states did not extend full faith and credit to the custo-

---

1. For a discussion of the background of the UCCJA, *see* Homer Clark, *Domestic Relations* § 13.5, pp. 774–782. (2d ed. 1985).

dy orders of their sister states, because of the inherently modifiable nature of those decrees. The full faith and credit doctrine requires the forum state to enforce a foreign decree, but only to the extent that it was enforceable in the rendering state. Because child support decrees are subject to modification in the rendering state until the child reaches the age of majority, the forum state considered itself equally free to modify the decree. This rule was approved by the United States Supreme Court on several occasions. *See, e.g., People v. State of New York ex rel. Halvey v. Halvey*, 330 U.S. 610, 67 S.Ct. 903, 91 L.Ed. 1133 (1947).

As the interstate trafficking in competing child custody decrees became more serious, there was some hope that the United States Supreme Court would remedy the situation by reversing its previous position and holding that such orders were entitled to enforcement under the Full Faith and Credit Clause. But, given the opportunity to do so in *May v. Anderson*, 345 U.S. 528, 73 S.Ct. 840, 97 L.Ed. 1221 (1953), the Court instead decided the case on an alternative ground, holding that a custody order is not entitled to full faith and credit if the rendering state lacked personal jurisdiction over the defendant.[2]

More significant than the majority opinion in *May*, however, was Justice Frankfurter's concurring opinion, in which he suggested that even if full faith and credit is not constitutionally required, comity should be extended to foreign decrees in order to avoid child-snatching, forum-shopping, and the like. *Id.* at 535, 73 S.Ct. at 844 (Frankfurter, J., concurring). A large number of state courts acted on this suggestion, at least for a time. But comity in child custody cases turned out to be more honored in the breach than in the application, as local courts found ways to avoid

enforcement of existing out-of-state orders on one legal pretext or another.

In response to mounting concern, the Uniform Commissioners promulgated the Uniform Child Custody Jurisdiction Act in 1968, with the express intent of eliminating interstate competition over custody matters, child-snatching, and unauthorized holdovers following authorized visitation periods. The various state legislatures were slow to adopt the measure, however, and momentum in favor of the UCCJA did not pick up speed until the late 1970s.

Finally, by 1980, most states had adopted the UCCJA, or some variation of it, but there were still a number of holdouts. At this point, the United States Congress stepped in, enacting 28 U.S.C. § 1738A, the Parental Kidnapping Prevention Act. Framed in much the same language as the UCCJA, although not identical to it, the PKPA was meant to make child custody jurisdiction uniform throughout the 50 states and thus prevent the non-UCCJA states from becoming havens for forum-shoppers and child-snatchers.

In effect, the PKPA requires that full faith and credit be given to foreign custody decrees, to the extent that the other state's "child custody determination [was] made consistently with the provision of [the PKPA]." 28 U.S.C. § 1738A(a). The significance of this provision has been diminished by the adoption of the UCCJA in some form in all 50 states. Nevertheless, as federal law the PKPA is pre-emptive, and it controls in any case in which there is a conflict between federal and state law. As this opinion demonstrates, the most significant difference between the PKPA and the UCCJA is the fact that under the Uniform Act, more than one state may have jurisdiction over a child custody matter at any given point in time, while under the PKPA, jurisdiction is theo-

---

**2.** As many courts and commentators have noted, this ruling by the United States Supreme Court has largely been ignored. Neither the Uniform Child Custody Act nor the Parental Kidnapping Prevention Act requires personal jurisdiction over a respondent, although they do contain provisions for notice and a hearing. Some concern has been expressed that if the

rule in *May v. Anderson* were to be enforced, the purposes of both the UCCJA and the PKPA would be frustrated. Clark, *supra,* at n. 1, p. 792. The issue is moot in the cases currently before us, because the Tennessee courts had personal jurisdiction over the parties in both instances.

retically limited to a single state, depending on the facts of the case.

Tennessee's version of the UCCJA is codified as T.C.A. §§ 36–6–201—225. Since its enactment in 1979, there have been no amendments to and relatively few reported decisions concerning the statute. It bears the title Uniform Child Custody Jurisdiction Act despite the fact that it is "non-uniform" with the original UCCJA in one very important respect.

The purposes of the UCCJA and the Tennessee statute are identical, however. And, because the need for uniformity among jurisdictions is so pressing, it can be argued that the statutory purposes set out in T.C.A. § 36–6–201 carry more than ordinary weight in the interpretation of other provisions in the act. They speak of the need to "[a]void jurisdictional competition and conflict with the courts of other states in matters of child custody which have in the past resulted in the shifting of children from state to state with harmful effects on their well-being"; the need to "[p]romote cooperation with the courts of other states to the end that a custody decree is rendered in that state which can best decide the case in the interest of the child"; the need to "[a]ssure that litigation concerning the custody of a child take place ordinarily in the state with which the child and his family have the closest connection and where significant evidence concerning the child's care, protection, training, and personal relationships is most readily available, and [assure] that [Tennessee] courts decline exercise of jurisdiction when the child and his family have a closer connection with another state;" the need to "[d]iscourage continuing controversies over child custody in the interest of greater stability of home environment and of secure family relationships for the child"; and the need to "[d]eter abductions and other unilateral removals of children", to "[a]void re-litigation," to "[f]acilitate enforcement of custody decrees" of sister states, to promote cooperation between courts, and to make the custody laws uniform. T.C.A. § 36–6–201.

The Tennessee statute tracks the UCCJA's definitional provisions closely, the most significant section for purposes of this opinion being that found in T.C.A. § 36–6–202(5):

"Home state" means the state in which the child immediately preceding the time involved lived with his or her parents, a parent, or a person acting as a parent, for at least six (6) consecutive months.... Periods of temporary absence of any of the named persons are counted as part of the six (6) months....

■ The "home state" definition is vital to an understanding of the two cases involved in this appeal, because under the Tennessee statute (but not the UCCJA), the courts of this state have jurisdiction to make or modify a child custody order if Tennessee is "the home state of the child at the commencement of the proceeding" or was the child's home state "within six (6) months before commencement of the proceeding" and the child has been taken outside Tennessee by a person claiming custody, leaving one parent (or "a person acting as parent") in Tennessee. T.C.A. §§ 36–6–203(a)(1)(B). In other words, if Tennessee has been the child's "home state" and the child is now in another jurisdiction, Tennessee continues to be the child's home state for an additional period of six months following removal, at which point the other state becomes the child's "home state," based on the child's presence there for a period of six consecutive months.

If Tennessee is *not* the child's "home state," a Tennessee court may assume jurisdiction only upon a finding that *no other state qualifies* as the child's "home state", or that the "home state" has declined to exercise jurisdiction and deferred to Tennessee as "the more appropriate forum to determine the custody of the child." T.C.A. § 36–6–203(a)(2)(A) and (3). Upon such a finding, a Tennessee court has jurisdiction to determine or modify custody if it also finds (1) that "[t]he child and at least one contestant have a significant connection with this state", (2) that "[t]here is available in this state substantial evidence concerning the child's present or future

care, protection, training, and personal relationship," *and* (3) that "[i]t is in the best interest of the child that a court of this state assume jurisdiction." T.C.A. § 36–6–203(a)(2).

■ Tennessee thus sets up a priority of circumstances to establish jurisdiction. Only if there is no "home state" jurisdiction or the "home state" defers to Tennessee can a Tennessee court exercise jurisdiction based on a "significant connection" with the child. Under this scheme, jurisdiction exists in only one state at a time. As it turns out, this approach is identical to the jurisdiction provision in the PKPA, but it is significantly different from the UCCJA's jurisdictional scheme, and thus different also from the Hawaii provision taken from the UCCJA that figures prominently in the *Brown* case and the Georgia provision, also taken from the UCCJA, that applies in the *Hall* case.

Under the UCCJA, jurisdiction may exist in more than one jurisdiction at a time. To avoid conflict, competition, and relitigation, the UCCJA encourages courts with simultaneous jurisdiction to communicate and cooperate with each other and, when appropriate, to defer to one another. Hence, under Hawaii Revised Statute § 583–3 and Georgia Code Annotated § 74–504 a court in those states could exercise jurisdiction on either a "home state" or a "significant connection" basis, while Tennessee could assume "significant connection" jurisdiction only if there were *no* "home state."

Perhaps because Congress recognized that courts with simultaneous jurisdiction might not cooperate or defer, as the UCCJA requires, or that it was unrealistic to expect full cooperations or deference, the PKPA follows the prioritized model also utilized by the Tennessee statute. In most other respects, however, all the statutes—the UCCJA, the PKPA, and the Tennessee version of the Uniform Act—are consistent with each other. Thus, the statutes of all three states (Tennessee, Hawaii and Georgia) provide, in those parts pertinent to this litigation, that "a court of this state *shall not exercise its jurisdiction* under this [act] if at the time of filing the petition a proceeding concerning the custody of the child was *pending* in a court of another state exercising jurisdiction substantially in conformity with this [act], unless the proceeding is stayed by the court of the other state because this state is a more appropriate forum for other reasons." T.C.A. § 36–6–207(a); H.R.S. § 583–6 (1985); Ga.Code Ann. § 74–507 (1981) (emphasis added). The PKPA likewise mandates deferral: "A court of a State *shall not exercise jurisdiction* in any proceeding for a custody determination commenced *during the pendency* of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination." 28 U.S.C. § 1738A(g) (emphasis added).

Under all three state statutes, the trial court is required to make a full inquiry of the parties and the pleadings, to determine whether there are simultaneous proceedings pending in other states, including a "direct ... inquiry to the state court administrator or appropriate official of the other state." T.C.A. § 36–6–207(b); H.R.S. § 583–6(b); Ga.Code Ann. § 74–507(b). Moreover, "[i]f the Court is informed during the course of the proceeding that a proceeding concerning the custody of the child was pending in another state before the court assumed jurisdiction it shall stay the proceeding and communicate with the court in which the other proceeding is pending to the end that the issue may be litigated in the more appropriate forum." T.C.A. § 36–6–207(c); H.R.S. § 583–6(c); Ga.Code Ann. § 74–507(c). Even if a court in one state has entered a custody decree "before being informed of a proceeding pending in [the other state]," that court must communicate with the other court "to the end that the issues may be litigated in the more appropriate forum." *Id.*

Finally, all three states require the recognition and enforcement of foreign decrees "of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this [act]," T.C.A. § 36–6–214; H.R.S. § 583–13; Ga. Code Ann. § 74–514, and restrict the juris-

diction of the forum court to modify an initial custody decree or a modification order of the rendering state. *See* T.C.A. § 36–6–215(a), H.R.S. § 583–14(a), and Ga. Code Ann. § 74–515(a), which prohibit modification of a foreign decree "unless (1) it appears to the court of this state that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this [act] or has declined to assume jurisdiction to modify the decree and (2) the court of this state has jurisdiction." The PKPA modification provision is substantially the same. It permits modification by the forum state of an existing decree of the rendering state only "if (1) [the forum court] has jurisdiction to make such a child custody determination; and (2) the [rendering] court no longer has jurisdiction to modify [the] custody determination [in question]." 28 U.S.C. § 1738A(f).

Finally, the statutory provisions of Tennessee, Hawaii, and Georgia regarding the guidelines for the finding of "inconvenient forum" are identical. *See* T.C.A. § 36–6–208, H.R.S. § 583–7; Ga.Code Ann. § 74–508. They permit "[a] court which has jurisdiction under this [act] to make an initial or modification decree [to] decline to exercise its jurisdiction any time before making a decree if it finds that it is an inconvenient forum to make a custody determination under the circumstances of this case and that a court of another state is a more appropriate forum." *Id.* at subsection (a). Such a finding may be made *sua sponte*, as well as on the motion of either party or a guardian ad litem. *Id.* at subsection (b). The factors to be taken into account in determining the issue of deference to a more convenient forum are generally predicated upon a determination of "the best interest of the child." *Id.* at subsection (c). They require the forum court to consider, specifically, the following:

(1) If another state is or recently was the child's home state;

(2) If another state has a closer connection with the child and his family or with the child and one or more of the contestants;

(3) If substantial evidence concerning the child's present or future care, protection, training, and personal relationships is more readily available in another state;

(4) If the parties have agreed on another forum which is no less appropriate; and

(5) If the exercise of jurisdiction by a court of this state would contravene any of the purposes stated [in the first section of this act].

T.C.A. § 36–6–208(c); H.R.S. § 583–7(c); Ga.Code Ann. § 74–508(c).

In determining which of two fori is the more convenient and whether to exercise or decline to exercise jurisdiction, courts are also encouraged to communicate with each other, to dismiss or stay proceedings upon a finding of inconvenience, and to maintain a registry for pertinent interchange of such information. *Id.* at subsections (d)–(i).

Finally, the state statutes incorporate a clean hands doctrine, permitting a court to decline jurisdiction "[i]f the petitioner for an initial decree has wrongfully taken the child from another state or has engaged in similar reprehensible conduct." T.C.A. § 36–6–209(a); H.R.S. § 583–8(a); Ga.Code Ann. § 74–509(a). Moreover, the statutes *require* a court to decline jurisdiction "to modify a custody decree of another state if the petitioner, without consent of the person entitled to custody, has improperly removed the child from the physical custody of the person entitled to custody or has improperly retained the child after a visit or other temporary relinquishment of physical custody." T.C.A. § 36–6–209(b); H.R.S. § 583–8(b); Ga.Code Ann. § 74–509(b).

This somewhat superficial summary of key provisions of the relevant statutes provides a general idea of what turns out to be a fairly complex scheme—complex in the sense that the state and federal statutes, while espousing the same goals, are not a perfect fit. As one noted commentator has observed, the terms of the UCCJA and the PKPA are "full of loopholes" and "technical enough to delight a medieval property lawyer." Clark, *Domestic Relation* § 13.5, 822, 825 (2d ed. 1985).

Nevertheless, those terms can be divined to require that we affirm the trial court's judgment in each of the two cases before us and reverse that of the Court of Appeals in both cases.

## 2. *The Brown Case*

The child who is the subject of the dispute in this case, Amy L. Brown, was born out of wedlock on July 14, 1987. Her parents, Teresa Jenkins and Nephi Brown, were never married, although they lived together off and on during a seven-year period between June 1982 and Jenkins's untimely death in an automobile accident on February 27, 1989. Brown is a native Hawaiian, who was working in Pigeon Forge, Tennessee when he met Jenkins. They subsequently went back to Brown's home in Hawaii, where they lived until 1988. Brown travelled a great deal in his job as an entertainment manager, and he was working and living in Japan at the time of Amy's birth in July 1987, returning to Hawaii for a two-week visit in September 1987. Brown did not return to Hawaii from Japan again until February 29, 1988, nor was he the major source of financial support for his daughter—during most, if not all, of the time she was in Hawaii with the child, Teresa Jenkins was a welfare recipient.

By December 1987, however, Teresa Jenkins had left Hawaii and returned to Tennessee, where she lived with her parents, Beulah and Bill Tipton, in Cocke County. She returned to Hawaii for two brief periods during 1988, from the end of February 1988 until April 17, 1988, and for a 30–day period in late fall of 1988. For purposes of the UCCJA and the PKPA, it is clear that Amy and her mother were residents of Tennessee from April 13, 1988 (and possibly December 1987), until the date of Teresa Jenkins's death, February 27, 1989, a period of at least ten months. Without question, then, Tennessee was Amy's "home state" at the time of her mother's death, under both T.C.A. § 36–6–202(5) and H.R.S. § 583–2(5). On March 1, 1989, three days after Teresa Jenkins's death, her parents filed a petition for tem-

porary custody of Amy in the Juvenile Court of Cocke County. On that same date, the Cocke County court awarded them temporary custody, but in the absence of any proof of service on Brown, even though he was still in Tennessee, having come for a brief period to attend Teresa's funeral. On March 3, 1989, the Tiptons filed this lawsuit as a petition to adopt Amy in the Cocke County Circuit Court.

On March 9, 1989, the Juvenile Court continued its award of temporary custody and ordered that Brown be notified of the proceedings by certified mail. The actions of the Juvenile Court in both regards are prescribed by T.C.A. § 36–6–204.

In the meantime, Nephi Brown had returned to Hawaii, where on March 9, 1989, he filed an action in the Third Circuit Court of Hawaii that was designated as Uniform Child Custody Jurisdiction No. 89–002. Pursuant to this filing, the Tiptons were served with a show cause order requiring them to bring the child to the State of Hawaii after 48 hours and giving them notice of a custody hearing on March 31, 1989. In response, the Cocke County Circuit Court, in which the March 3 adoption action was pending, entered an order restraining Brown "from pursuing or taking any action in the Family Court of the Third Circuit Court for the State of Hawaii until further orders of this court." At that point, the Tiptons amended the adoption action, seeking in the alternative a custody order from the Cocke County Circuit Court. (The Juvenile Court proceeding and the Circuit Court proceeding were subsequently consolidated.)

It is unclear from the record exactly when the Hawaii court first learned of the pendency of the Tennessee custody petition. Brown's March 9 petition recites that to his knowledge, no other custody proceeding involving Amy had been brought. On March 30, 1989, however, the Hawaii court was put on notice of the Tennessee proceeding by appearance filed *pro se* by the Tiptons, for the limited purpose of contesting that court's jurisdiction to make a custody determination, given Tennessee's status as Amy's "home state" and the pen-

dency of a custody proceeding there. A copy of the Tennessee adoption petition was attached to the filing.

At this point, the Hawaii court should, at the very least, have followed the dictates of H.R.S. § 583–6 and stayed (or dismissed) the proceeding before it, set up lines of communication with the Tennessee court, and made a joint decision with the Cocke County Court that one or the other was the more convenient forum under H.R.S. § 583–6. Indeed, under H.R.S. § 583–2(5), the PKPA, and T.C.A. § 36–6–202(5), Tennessee was Amy's "home state" and, therefore, under the latter two statutes, Tennessee was the only state with jurisdiction, requiring that the Hawaii court decline to exercise whatever jurisdiction it purportedly had.

■ In fact, because the Hawaii jurisdiction statute, H.R.S. § 583–3, conforms to the Uniform Act and not to the PKPA and the Tennessee version of the UCCJA, the Hawaii court was able to invoke H.R.S. § 583–3(a)(2) and to assume putative jurisdiction based on "the child's best interest," under a finding that "the child and his parents, or the child and at least one contestant, have significant connection with this State and there is available in this State substantial evidence concerning the child's present or future care, protection, training, and personal relationships . . . ."

The Hawaii decree, entered on April 25, 1989, draws just such a conclusion. It is, however, no more than a conclusion, because there are *no* findings of fact in the Hawaii decree to support the exercise of "significant connection" jurisdiction under H.R.S. § 583–3(a)(2). As the record shows, Amy's only connection with the state of Hawaii was the fact of her birth there and her residence for the first five months of her life. There is nothing to suggest "substantial evidence" of the kind described in § 583–3(a)(2) that would have given the Hawaii court a basis for determining what was in Amy's "best interest" with respect to a determination of custody. Indeed, with all due deference to the Hawaii court, its decree of April 25, 1989, appears to have produced exactly the kind of interstate con-

flict that the UCCJA and the PKPA were intended to prevent. A review of the legislative purposes enumerated in those statutes and codified by H.R.S. § 583–1 confirms that conclusion.

■ But the litigation concerning Amy Brown was not yet over. On July 14, 1989, a full evidentiary hearing on the Tennessee adoption and custody petition was held. Amy's father, Nephi Brown, was present and represented by counsel. He had filed an answer to the Tiptons' petition and submitted himself in all respects to the jurisdiction of the Tennessee Court, including the giving of testimony at the hearing. On July 19, 1989, the trial judge rendered a Solomon-like judgment, in which he declined to terminate Nephi Brown's parental rights and allow the Tiptons to adopt Amy, but found, based on extensive factual bases set out in the judgment, that it was in Amy's best interest to remain in the custody of her maternal grandparents, Beulah and Bill Tipton. Our careful review of the record leads us to conclude that this decision is overwhelmingly supported by the evidence in the record.

Nevertheless, the trial judge also determined that Brown should have reasonable visitation privileges with his daughter, and set up a schedule that permitted Amy to go to Hawaii for a three-week visitation period beginning on December 26, 1989, to be repeated annually thereafter, and an eight-week period beginning the following June, also to be repeated annually thereafter "until the child reaches legal age." (The order also contained specific instructions on the allocation of expenses for these trips.) There were additional permissible visitation periods scheduled within the state of Tennessee.

Despite his apparent submission to the Cocke County Circuit Court's authority, evidently Nephi Brown was not acting in good faith with respect to the orders of that court. The record suggests that he had purchased airline tickets for himself and the child, leaving the Knoxville airport on a flight scheduled to depart at 8:04 p.m. on July 19, 1989, the same day the Cocke County court's judgment was released. An

investigation by the county sheriff's department, requested by the Tiptons, revealed not only the fact of the airline reservations, but also the fact that—without Nephi Brown's knowledge—the flight had been cancelled by the carrier. Brown nevertheless arrived at the Tiptons' house late that afternoon, seeking to exercise visitation, and was refused permission to leave the house with the child.

Notwithstanding this incident, Brown was allowed to exercise his previously ordered visitation in December 1989. However, he did not return the child to the Tiptons in January 1990, as he had been ordered to do under the terms of the Cocke County decree, and as far as the record indicates, Amy remains in Hawaii to this date.

■ Brown had appealed the judgment of the trial court denying him custody of Amy, and in due course the matter was heard by the Court of Appeals. The intermediate court held that the Hawaii custody decree was entitled to full faith and credit, apparently deciding the question under constitutional principles that are not applicable to custody decisions, for the reasons set out in Section 1 of this opinion. To the extent that the Court of Appeals recognized the applicability of Tennessee's version of the UCCJA, it misinterpreted T.C.A. § 36–6–203(a) to permit jurisdiction based on "significant connection" with the state of Tennessee. But, also as pointed out in Section 1 of this opinion, Tennessee, like the PKPA, prioritizes grounds for the exercise of child custody jurisdiction, recognizing "significant connection" jurisdiction *only* if the court finds that the child in question has no "home state." In this case, Amy's "home state" was clearly and undeniably Tennessee, and, thus, when the Hawaii court purported to exercise jurisdiction on the basis of a "significant connection" between Amy and the state of Hawaii, it was not acting substantially in compliance with the PKPA. Any conflict between state and federal law, it must be recalled, is required by the federal supremacy clause to be decided under the federal statute.

■ In addition to its conflict with the federal statute and the obvious lack of evidence to support it, the Hawaii judgment of April 25, 1989, is vulnerable on several other bases. As noted, once the Hawaii court had notice of the prior Tennessee action, it should have stayed its own proceeding, dismissed that action, deferred to the Tennessee court, decided that it was not the convenient forum to decide the issue, or, at the very least, interrupted its proceedings long enough to communicate with the court in Cocke County. Faced with a multitude of possible statutory violations, we conclude that, first and foremost, Hawaii did not have jurisdiction to make a custody determination under 28 U.S.C. § 1738A(c). But even if it did have jurisdiction under its own version of the UCCJA, a possibility refuted by the factual record in this case, the April 25 judgment was obviously modified by the entry of the Cocke County judgment on July 19, 1989.

The authority of the Tennessee court to modify the order of another state is found in T.C.A. § 36–6–215. It is helpful at this point of our analysis to recall that the purposes of the UCCJA intend that a custody determination be made in a child's best interest in the forum most conveniently situated to ensure that result. Once jurisdiction has been exercised, the UCCJA weighs strongly in favor of its continuation, and, thus, its enforcement in a foreign state. However, modification by a foreign state is allowed under carefully controlled circumstances. Under both the Hawaii and Tennessee versions of the UCCJA, modification of a foreign decree is permitted when "(1) it appears to the [forum] court ... that the court which rendered the decree does not now have jurisdiction under jurisdictional prerequisites substantially in accordance with this [act] ... and (2) the court of this state has jurisdiction." T.C.A. § 36–6–215, H.R.S. § 583–14. We hold that Hawaii, if it ever had jurisdiction to determine custody in this case, did not have jurisdiction in July 1989, under the PKPA, and that Tennessee, Amy's "home state," did have jurisdiction. Thus, the judgment entered by the Tennessee Court on July 19,

1989, was either an "initial decree" or a "modification decree," but in any event it was a valid and enforceable order. Moreover, it was binding on Nephi Brown, pursuant to the terms of T.C.A. § 36–6–213, which is virtually identical to H.R.S. § 583–12. The Tennessee provision is as follows:

*Binding and conclusive nature of court decree.* A custody decree rendered by a court of this state which had jurisdiction under § 36–6–203 binds all parties who have been served in this state or notified in accordance with § 36–6–206 or who have submitted to the jurisdiction of the court, and who have been given an opportunity to be heard. As to these parties, the custody decree is conclusive as to all issues of law and fact decided and as to the custody determination made unless and until that determination is modified pursuant to law, including the provisions of this part.

In contempt of the July 19 order, Nephi Brown refused to return his daughter to Tennessee at the end of the visitation period. As we have seen, he cannot claim the April 25, 1989, order of the Hawaii Circuit Court as a valid reason for doing so, and if he files a petition for modification in either Hawaii or Tennessee, he will be legally stymied by the "unclean hands" provision in both T.C.A. § 36–6–209 and H.R.S. § 583–8, which are virtually identical, as set out in Section 1.

In the *Brown* case, we affirm the trial court's judgment awarding custody to the Tiptons and remand the case for further proceedings. We suggest that the trial judge reassess the present position of the parties, make whatever adjustments to the order that circumstances dictate, and, if appropriate, forward the Tennessee judgment to the Hawaii Circuit Court for recognition and enforcement under H.R.S. § 583–13.[3] We recognize, as the trial judge must also, that the passage of time

may well make the Tiptons' victory in this court a Pyrrhic one. Nevertheless, we trust that when requested to cooperate under the auspices of the Hawaii version of the UCCJA, the courts of that state will respond affirmatively, as we trust the court of Tennessee would do in a similar situation.

### 3. *The Hall Case*

Indeed, the Knox County Circuit Court made just such an accommodation in the *Hall* case, only to have its judgment overturned by the Court of Appeals. We conclude, in light of the facts set out below, that the trial court's judgment in *Hall* was essentially correct under Tennessee's version of the UCCJA and must, therefore, be reinstated.

Deborah and Harry Hall were married in 1982 in Georgia but moved soon after to Knoxville, Tennessee, where he was employed; they lived there together until late 1986. Matthew, the child whose custody is at stake here, was born on April 8, 1984. The couple separated in September 1986, and Deborah Hall took the child and moved back to Atlanta, Georgia, in December of that year, shortly before the divorce action was filed. The divorce decree was entered on June 11, 1987; it gave Deborah Hall custody of Matthew and gave liberal visitation to the father, Harry Hall.

The parents were able to maintain a long-distance visitation schedule for the next two years, but as the child grew older and circumstances in their work patterns changed, it became obvious that some adjustments in the schedule would be necessary. Unfortunately, the parties were unable to reach an agreement concerning visitation, and on March 30, 1990, Deborah Hall filed a petition to modify in the Georgia Superior Court. Notice of the petition was served on Harry Hall on April 12, 1990.

---

**3.** The statute provides as follows:
Recognition of out-of-state custody decrees. The courts of this State shall recognize and enforce an initial or modification decree of a court of another state which had assumed jurisdiction under statutory provisions substantially in accordance with this chapter or which was made under factual circumstances meeting the jurisdictional standards of the chapter, so long as this decree has not been modified in accordance with jurisdictional standards substantially similar to those of this chapter.

In the meantime, on April 3, 1990, Harry had filed a petition to modify in the same Knoxville chancery court that had rendered the initial decree, and an emergency hearing was set in that court for April 11, 1990. The child's mother appeared on that occasion, and the dispute was set for a full evidentiary hearing on May 2, 1990.

On April 26, 1990, a Georgia petition requesting cooperation was filed in the Tennessee court. In that petition, counsel for Deborah Hall conceded (erroneously, we think) that Tennessee continued to have jurisdiction, but argued that Tennessee should decline to exercise that jurisdiction, predicated on the statutory criteria in T.C.A. § 36–6–208(c)(1)–(5), set out in full in section 1 of this opinion.

On May 2, 1990, Deborah Hall also filed a response to her ex-husband's petition for modification. That filing did not request declination, but apparently there was a motion to dismiss for jurisdictional reasons, made on behalf of Deborah Hall and filed on or before May 30, 1990. On that date, the trial judge entered an order dismissing Harry Hall's petition for modification, based on the court's determination that Georgia was the more appropriate forum in which to determine the questions raised in the Tennessee petition.

■ The trial court's determination was based on a correct interpretation of Tennessee law, specifically the jurisdictional provisions in T.C.A. § 36–6–203, the modification provisions in § 36–6–215, and the criteria for determining whether to decline jurisdiction in § 36–6–208.

First of all, it should be noted that Georgia had become the child's "home state" under T.C.A. § 36–6–202(5). If the petition to modify filed by Harry Hall in April 1990 is seen as the "commencement of the [current] proceeding," which we conclude is the correct interpretation of § 36–6–203(a), then the trial court did not have jurisdiction to determine the propriety of modification, because the Tennessee statute, unlike the UCCJA and the Georgia version of the UCCJA, does not permit a court of this state to exercise "significant connection" jurisdiction under § 36–6–203(a)(2)(A) un-

less "[i]t appears that *no* state has jurisdiction" as the "home state." (Emphasis added.) At the point that Harry Hall filed for modification, the Georgia courts, of course, had "home state" jurisdiction.

■ But even if Tennessee arguably had jurisdiction, the Tennessee trial court was correct in its decision to defer to the Georgia court, because the facts before the court met the three principal criteria of T.C.A. § 36–6–208(c)(1), (2) and (3), regarding a "finding of inconvenient forum." Georgia is the child's "home state," the first of the three main criteria set out in subsection (1); Georgia "has a closer connection with the child and family or with the child and one ... of the contestants," as provided in subsection (2); and there is "more readily available" in Georgia "substantial evidence concerning the child's present or future care, protection, training, and personal relationships ...," as set out in subsection (3).

Finally, although there were only four days between the filing of the mother's petition to modify in Georgia and the father's petition to modify in Tennessee—and despite the fact that we are reluctant to condone what might appear to be a "race to the courthouse"—the fact is that the Georgia proceeding was properly initiated there, in the child's "home state," and was pending at the time the Tennessee action was initiated. Under both Tennessee and federal law, the trial judge in Tennessee should have (and ultimately did) stay or dismiss the Tennessee action, pending a determination of the issue by the Georgia court. *See* T.C.A. § 36–6–207(a) and 28 U.S.C. § 1738A(g). As noted in Section 1 of this opinion, the federal statute preempts state law and provides:

A court of a State *shall not exercise jurisdiction* in any proceeding for a custody determination commenced during the pendency of a proceeding in a court of another State where such court of that other State is exercising jurisdiction consistently with the provisions of this section to make a custody determination. (emphasis added).

Since the PKPA, like the Tennessee statute, makes "home state" jurisdiction the preferred if not exclusive basis for awarding or modifying custody, it cannot be argued that the Tennessee court erred in declining to exercise jurisdiction and deferring to the Georgia court.

In deciding otherwise, the Court of Appeals relied almost solely on this Court's opinion in *State ex rel Cooper v. Hamilton*, 688 S.W.2d 821 (Tenn.1985). In that child custody case, the parents were divorced in Indiana, the state of their marital residence, in January 1980. Mr. Cooper was awarded custody of the two older children and Mrs. Cooper the youngest child, a daughter three years old at the time. Visitation was granted both parents. The day after the divorce, however, Mrs. Cooper left Indiana without notice to her ex-husband and went to Cocke County, Tennessee, where she remarried. A month later, in February 1980, Mr. Cooper, still unsuccessful in his efforts to find his daughter, filed a contempt petition against his ex-wife in Indiana that was eventually granted. He also asked the court to modify the divorce decree to give him custody of his youngest child. The Indiana court modified its own decree on May 12, 1980, to award him temporary custody of the child, whose whereabouts at the time were still unknown.

Mr. Cooper finally located his ex-wife and daughter in Tennessee in January 1981 and filed a petition for a writ of habeas corpus here, seeking to have his daughter returned to Indiana so that the Indiana court could further adjudicate the custody dispute. Apparently the child's mother simultaneously filed a petition in the Cocke County Circuit Court requesting modification of the visitation provisions contained in the original Indiana decree. *Cooper* at 822–832.

At this point, under the statutory provisions discussed above, the trial court in this state should have ruled that although Tennessee was the child's "home state," jurisdiction should not be exercised in Tennessee while proceedings were pending in Indiana; the effect would have been to defer to Indiana the authority to decide all questions related to the custody of the Cooper child. Instead, the Tennessee court assumed jurisdiction and refused to recognize and enforce the Indiana decree, despite the mandate to do so in T.C.A. § 36–6–214. The Tennessee court held that the *ex parte* proceedings in Indiana following the divorce were of no force and effect, because the child's custodial parent had not been afforded "due process". *Cooper* at 823.

Due process, of course, is treated in the UCCJA and the Tennessee version of the UCCJA under the notice provisions of T.C.A. § 36–6–206. It is sufficient to note at this point that the authority of a court to act in the best interest of a child cannot be thwarted by the actions of one parent in hiding the location of the child from the other parent.

In *Cooper*, we held that the jurisdiction of the Indiana court to decide the issues in dispute continued, despite the fact that Tennessee had become the child's "home state." *Cooper* at 826. We stressed the concern of the UCCJA in the retention of jurisdiction by the rendering court.

What we did not stress was the effect of the mother's conduct in failing to honor the orders of the Indiana court's original decree, awarding visitation rights to the father. In T.C.A. § 36–6–209, the so-called "unclean hands" statute, the residual relief clause in subsection (b) provides that in a modification proceeding, "[i]f the petitioner had violated any other custody decree of another state, the [forum] court ... may decline to exercise its jurisdiction if this is just and proper under the circumstances." In *Cooper*, the petitioner in the Tennessee action was the child's mother, who had spirited the child away from Indiana and deprived the father of the visitation privileges granted in the original decree. Under T.C.A. § 36–6–209(b), the Tennessee court should instead have declined to assist her in any way and should have recognized and enforced the Indiana decree, both the original award and the modified award of custody.

The contrast between the facts in *Cooper* and those in *Hall*, the case now before us, is dramatic. Here there is no intimation of misconduct by either party. Both parents had been struggling long-distance to accommodate the child's best interest, and as the circumstances changed, the need for modification of the visitation schedule was clearly indicated. When the two parties could not agree on a new schedule, the pertinent question became: which of two courts is authorized to decide the matter for them?

The Tennessee trial court's order deferring to the jurisdiction of Georgia is in keeping with both the letter and the spirit of the UCCJA. It is also mandated by federal law. We therefore hold that *State ex rel. Cooper v. Hamilton*, while proper on the facts of that case, does not mandate a different result in this case.

The judgment of the Court of Appeals in *Hall v. Hall* is reversed, and the case is remanded to the trial court for the entry of appropriate orders under T.C.A. § 36–6–208.

### 4. *Conclusion*

As companion cases, these two records represent two sides of the same coin. In the *Brown* matter, the Hawaii court should have deferred to the jurisdiction of the Tennessee court and failed to do so, thus frustrating the purposes of the UCCJA by setting up simultaneous litigation in two different states, with competing and conflicting results. One of the flaws in the UCCJA and the PKPA, especially since the latter has been held not to confer jurisdiction on the federal courts to settle disputes between states in these circumstances, *Thompson v. Thompson*, 484 U.S. 174, 108 S.Ct. 513, 98 L.Ed.2d 512 (1988), is the absence of a remedy for the failure of one state or the other to follow the law. Instead the statutes assume a degree of communication and cooperation that has been conspicuously absent in the *Brown* litigation.

On the other hand, the purposes of the UCCJA and the PKPA were well-served by the Tennessee court's decision to decline the exercise of jurisdiction in the *Hall* matter. Cooperation in that case will allow the state best able to act in the child's interest to adjudicate disputes concerning custody and jurisdiction.

In both cases, the judgment of the Court of Appeals is reversed, the judgment of the trial court is reinstated, and the case is remanded to the trial court for further proceedings. Costs in *Brown* are taxed to the appellee, Nephi Brown. Costs in *Hall* are taxed to the appellee, Harry S. Hall.

REID, C.J., and DROWOTA, O'BRIEN and ANDERSON, JJ., concur.